FREEMAN UNITED COAL MINING COMPANY, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Bertha Helm, Widow of Hartley Helm, Deceased, Appellant).

Fifth District (Industrial Commission Division)   No. 5—91—0383WC

Opinion filed February 5, 1992.

Wayne R. Reynolds, of Belleville, for appellant.

Kenneth F. Werts and Nancy R. Kuhnke, both of Craig & Craig, of Mt. Vernon, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The claimant, Bertha Helm, widow of Hartley Helm, deceased, appeals from the judgment of the circuit court reversing the decision of the Illinois Industrial Commission (hereafter referred to as the Commission). With one member dissenting, the Commission found that the decedent was exposed to the hazards of an occupational disease, namely, black lung disease, arising out of and in the course of his employment, to which he was last exposed on January 3, 1983, and that a causal relationship exists between such exposure and the decedent's death. Accordingly, the Commission found the claimant entitled to death benefits under section 7 of the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 172.42). The arbitrator determined that the claimant had failed to prove by a preponderance of credible evidence that the decedent's death, "which all agree was the result of pulmonary thromboemboli," was causally related to exposure to an occupational disease.

The claimant presents a single issue for review, whether the circuit court erred in finding the decision of the Commission against the manifest weight of the evidence.

At the hearing before the arbitrator, conducted on August 17, 1989, the claimant testified that she and her husband had been married on October 16, 1935, and that her husband had died on May 15, 1983, at the age of 67. He had begun to work as a coal miner at the age of about 17 and had always worked below ground. His working conditions were, she said, very dusty, as attested to by his laundry, which was black with coal dust, and her own occasional visits to the mine. She noticed that her husband, who did not smoke, had had some breathing problems for the last 10 to 12 years of his life. When he was about 30 years old, an injury to his legs caused phlebitis in one of his legs. He had retired from employment with the respondent herein, Freeman United Coal Mining Company, in January of 1983.

Testifying by evidence deposition taken on behalf of the claimant on October 13, 1988, was Dr. Edward Corder, who is certified as a

diplomate of the American Board of Family Practice. Hartley Helm was his patient from sometime during the 1960's until about 1974, when Dr. Corder left private practice. In 1978 Dr. Corder resumed private practice; in 1980 Mr. Helm became his patient again and remained as such until his death. In 1980 Dr. Corder saw Mr. Helm because he was "having trouble with his breathing" and referred him to Dr. Sanjabi of the Carbondale Clinic to examine him to determine whether he had black lung disease. Dr. Corder had received no report with respect to that examination.

On April 19, 1983, Mr. Helm came to him complaining of right-sided chest pain, apparently on deep inspiration. Mr. Helm denied having had any recent cold or upper-respiratory infection. Because of the pain in the chest, Dr. Corder suspected pneumonia. A chest X ray taken that day revealed pneumonia, he said, but "[h]is temperature was normal, surprisingly, 98 degrees." Dr. Corder prescribed antibiotics. The following day, April 20, 1983, Mrs. Helm called Dr. Corder, stating that her husband's pain was much worse, he could not lie down, and he was having difficulty breathing. He was admitted to the hospital that day, where he remained until his death about 3½ weeks later. When Mr. Helm developed sudden shortness of breath while in the hospital, Dr. Corder got a consultation from Dr. M.T. Joseph, a cardiologist.

A lung scan performed at that time showed possible pulmonary embolism. Dr. Corder stated that Dr. Joseph found

"possible blood clots in the legs or the right leg especially, and we suspected that the blood clots were coming from his right leg, and this caused emboli to be passed to the lungs, and of course we immediately put him on anticoagulation heparin therapy to try to thin his blood to stop this clotting. He continued to pass emboli in spite of all the treatment we gave."

Dr. Corder testified with respect to Mr. Helm's activity: "He had been up and down to the bathroom, you know. He was improving as far as his pneumonia was concerned until he suddenly started having these shortness of breath episodes." Dr. Corder described the "mechanism of death" as confirmed by autopsy:

"His final diagnosis was that massive pulmonary thromboemboli, bilateral, this was in both lungs, involving the large pulmonary arteries and small pulmonary arteries, and the second diagnosis was marked pulmonary emphysema with bulla formation, that's sort of blisters on the lungs that form in an emphysema patient due to chronic overfilling of the lungs. They breathe air in, but they have difficulty getting it out. That's

where we come up with the term 'obstructive.' It gets in okay, but they can't get it out, and the lungs are chronically over-filled. So the second item on the autopsy confirmed my diagnosis, which I've been treating him for all along, [which] was chronic emphysema and chronic obstructive pulmonary disease, and the third one was that he had black lung disease or coal miner's lung, and also on the autopsy he [Dr. Cornelio Katubig] determined that he had arterial sclerotic heart disease and that he had an old infarction some time."

Concerning his own diagnosis made while Mr. Helm was alive, Dr. Corder testified:

"I think I pointed out quite clearly that since I've seen him in 1980 that [sic] one of the diagnoses was chronic obstructive pulmonary disease, which I called emphysema at that time, and since I did not have access to the black lung tests which were being made, I had no way of knowing specifically that that was possibly black lung that I was dealing with. I suspected it, because anybody, any man who works in the mine, you certainly suspect it."

The witness testified that Mr. Helm had coal worker's pneumoconiosis, as shown by the autopsy, had worked in the mines long enough to develop it, and would not have developed it without having worked in the coal mines.

Dr. Corder testified concerning a prior injury to Mr. Helm's right lower leg:

"He had a past history of a bruise of his right lower leg at some time in the past. I can't put it down to an exact date, but he had problems with that right lower leg for some time. The circulation wasn't very good in there apparently, because he would develop a rash, an irritated rash, on that right lower leg in the area where he had been bruised in the past, and we had to deal with that several times. Due to his wearing boots and sweating a lot and so forth, the skin would become irritated and break down, and I suspected that possibly one of the reasons why he developed thrombophlebitis in that leg might have been due to the poor circulation due to that old injury many years ago."

The witness testified, with regard to the role played by chronic obstructive-pulmonary disease in complicating the treatment of or recovery from pneumonia, that "we have already weakened lungs with the chronic obstructive pulmonary disease and emphysema, and it makes them more susceptible to being subject to infections, and the weak-

ened lungs and so on probably made him more susceptible to pneumonia, for which he was treated." Testifying in response to a question concerning the role played by chronic lung disease in the treatment of or recovery from pneumonia, Dr. Corder stated that in the case of Mr. Helm, after he had been in the hospital,

"his pneumonia was improving and that wasn't really the problem, the pneumonia wasn't the problem at the time he took worse. He was actually—he had the lung problem because of blood clots coming from his lung—or right leg, and this caused further dyspnea or shortness of breath and changes in his lungs that we saw on lung scan."

Dr. Corder testified that the "acute, definite cause of death" was "the passage of blood clots to the lungs," that is, "massive pulmonary thromboemboli bilateral involving the large pulmonary arteries and small pulmonary arteries." Asked if he could form an opinion, based upon a reasonable degree of medical certainty, as to whether the decedent's coal worker's pneumoconiosis was a contributing factor in his death, Dr. Corder answered:

"This is much the same as dressing room quarterbacking after the game. In other words, we can after the fact. Now that we have the autopsy reports, I could say that, but prior to that, all I had to deal with was knowing that he had pneumonia and chronic obstructive pulmonary disease, and after his death, of course, the autopsy showed and confirmed the fact that he did have coal miner's lung, which was probably one of the weakening factors which led to his development of pneumonia, which led to his being hospitalized and put at bed rest, which led to his development of thrombophlebitis in his leg, which led to passage of thromboemboli to his lungs. So it figures in there. We can't escape it."

On cross-examination Dr. Corder testified that the radiologist's report of the chest X ray taken on April 19, 1983, indicated the presence of an infiltrated process compatible with either pneumonia or pulmonary emboli but that, since Mr. Helm gave no complaint of "anything in his leg," the doctor treated the condition of right-lower-chest pain as pneumonia. Dr. Corder had never determined the etiologic agent of the pneumonia because Mr. Helm had no cough or sputum so that a definite diagnosis could be made. He stated that he was "[n]ot necessarily" suggesting that the coal worker's pneumoconiosis caused the pneumonia. He could not tell, he said, when the thrombus actually formed.

On redirect examination Dr. Corder testified that being bedridden, "as that term would apply to the way Mr. Helm was during his hospitalization," increases a person's risk of developing thromboemboli. Asked, "Is there any doubt in your mind coal worker's pneumoconiosis was a contributing factor in this man's death?" Dr. Corder responded:

"I think I've pretty well made that clear in previous testimony on this. We've gone through the fact that he had chronic lung disease, and in retrospect, we know that part of that chronic lung disease was due to coal miner's lung, which could weaken the lungs and make them more susceptible to respiratory problems. So as I say, in retrospect, considering the diagnosis from autopsy that he had coal miner's lung, that had to be figured into being a factor contributing to his death."

Dr. Corder stated further that the decedent's "being more sedentary, I think, contributed to the production of thromboemboli." He indicated that his concern with respect to immobility had caused him not to have Mr. Helm hospitalized initially. He testified, "On the basis of concerning what the radiologist had said, I preferred to have him up and about." Earlier, on cross-examination Dr. Corder had stated:

"The thing is that I treated him as an outpatient for the pneumonia in the beginning, because, you know, with this ringing in the back here of possible pulmonary embolis [sic] and so on, being up and about would be the best treatment, and being sedentary is not necessarily. So I didn't want to have to put him in the hospital. Because of his worsening condition the next day, I had to, and he probably layed [sic] around in the bed more than he would have if he would have been at home."

Dr. Cornelio Katubig, a pathologist, testified in an evidence deposition taken on behalf of the claimant on September 7, 1988, that as a result of the autopsy he had performed upon the body of the decedent the day after his death, he had made the following findings:

"In summary I thought that the lung was emphysematous, severely emphysematous, with bulla formation. When you say bulla formation, that means that there is severe emphysema. And the plueralized [sic] extremity black and [sic] lymph nodes are large and black and there are [sic] fibrosis, patchy fibrosis, and to me that's black lung or coal miner's pneumoconiosis. And then on cutting the lung we saw or I saw thrombo-emboli in both lungs, which I thought was the cause of death. And also I look for infarcts, in other words, the effect of the emboli, but

there are no infarcts so this means this is an acute process and there was no time for an infarct to occur."

He described bulla as "air spaces, alveolar spaces, when their septa, in other words things that will separate these spaces are destroyed, then the air spaces are joined in like one cavity and that's a bulla." "Fibrosis" is, he said, pneumoconiosis. Concerning infarcts Dr. Katubig elaborated:

"Usually if the blood supply to an organ is occluded then usually it's a blood clot that will occlude it, that area which is being supplied by the vessel, will—will die and we call it infarct. And there is a certain amount of time for the infarct to form and there is no time for that infarct to form here, that's why I said there is none, which means that the presence of the thrombo-emboli are [sic] acute, it occurred suddenly."

Dr. Katubig's diagnosis upon autopsy was as follows:

"First the cause of death was the massive pulmonary thromboemboli and then there is severe emphysema with bulla formation and black lung disease, which I thought was coal workers' pneumoconiosis because of the long history of this man being in the coal mines, arteriosclerotic heart disease, which is part of my finding."

He testified that the microscopic findings meant that "this is a pulmonary pneumoconiosis and probably because of the emphysema—that's the main thing, the pulmonary emphysema, and what he came to the hospital for was probably due to these and whatever caused his death is due to a blood clot in the pulmonary arteries." In Dr. Katubig's opinion, the cause of the decedent's coal worker's pneumoconiosis was "[h]is long history of being a coal miner." He testified that the primary cause of Mr. Helm's death was massive blood clots in the lungs. When he was asked:

"Doctor, taking into consideration the totality of data which you were able to glean from your autopsy and your autopsy findings as well as the clinical history which you have available to you can you form an opinion, based on a reasonable degree of medical certainty, as to whether coal workers' pneumoconiosis was a contributing factor in this man's death?"

Dr. Katubig answered:

"Well, if he was admitted because of his lung condition and he was put in the hospital for so many days, I don't know how many days, and being bedridden, if he were bedridden, he can form thrombo-emboli or thrombosis or phlebitis in his legs and this can certainly cause the thrombo-emboli in the lung."

With respect to the effect of being bedridden, he indicated that lack of mobility will predispose a person to "plaque formation" anywhere, "usually the legs."

On cross-examination Dr. Katubig testified that the cause of Mr. Helm's death was the development of a thrombo-embolism in the lower legs, which broke loose and lodged in the pulmonary arteries. When he was asked if his opinion that Mr. Helm was suffering from coal worker's pneumoconiosis is based upon a history provided to him, Dr. Katubig responded:

> "No. The fact that I am looking at fibrosis, anthracotic pigments, extensive distribution it leads me to believe that even if I don't know the history I would still call this—I mean I will ask if he has a history of working in the mines."

Asked whether he could say with certainty that the emphysema he diagnosed was, in fact, caused by coal worker's pneumoconiosis, Dr. Katubig answered, "Very, very strongly that it is probably caused by coal workers'." He had developed no opinion, he said, with regard to the cause of pneumonia in Mr. Helm.

On redirect examination when Dr. Katubig was asked, "Doctor, earlier in the deposition I believe you expressed your opinion that the presence of coal workers' pneumoconiosis was a contributing factor in death because of the—when he was admitted to the hospital he was ill, bedridden and therefore more predisposed to developing a thrombo-emboli?" he answered, "Right." Dr. Katubig did not have any pulmonary-function or blood-gas studies but stated that, based upon what he had seen in Mr. Helm's lungs, he would expect him to be impaired during life and that, based upon his autopsy findings, he would expect that "[t]here will be changes in the blood gases, pulmonary function."

Testifying by evidence deposition taken on April 18, 1989, on behalf of the claimant, Dr. M.T. Joseph, a cardiologist, stated that he had first seen Mr. Helm in 1974 and had seen him "for few years" until Mr. Helm went back to his family physician, Dr. Corder. Then, while he was in the hospital in April of 1983, Dr. Corder called Dr. Joseph in for consultation concerning the reason for Mr. Helm's rapid heart rate and increasing difficulty in breathing. Dr. Joseph saw Mr. Helm at the hospital on April 27, 1983, and evaluated him for pulmonary embolism. The test results came back positive for pulmonary emboli, at which time Dr. Joseph began to treat him with blood-thinning medication. Dr. Joseph stated that his records reflected the following clinical course: "I do not have that information here, but I believe he was admitted with the pneumonia and he was given antibiotics and he

was getting better. Then on 4/27/83 his condition got worse, that's why I was called in consultation." Dr. Joseph continued to provide anticoagulation treatment to Mr. Helm until his death, the cause of which was, he said, massive pulmonary thromboemboli. When asked whether he could form an opinion, based upon a reasonable degree of medical certainty, whether Mr. Helm's coal worker's pneumoconiosis was a contributing factor in his death, Dr. Joseph answered, "Patients with chronic obstructive pulmonary disease may have—might have contributed to the death of Mr. Hartley Helm." Dr. Joseph includes coal worker's pneumoconiosis within chronic obstructive pulmonary disease. He said that lack of mobility plays a role in the development of pulmonary emboli by stasis, that is, the stagnation of blood in the lower legs or the pelvic area which can contribute to the formation of a clot. He stated that underlying chronic lung disease does not necessarily make the treatment of pneumonia more difficult but it may prolong the course of treatment for pneumonia, because such patients have decreased resistance, and thereby prolong recovery from the pneumonia. Asked, "And, Doctor, if Mr. Helm's underlying chronic lung disease was such, by underlying chronic lung disease I mean including his pneumoconiosis, was such that he was required to be immobile longer than normal could or might that immobility have been a contributing factor in the development of the pulmonary emboli?" he answered, "That may be a contributing factor."

On cross-examination he testified that he "believe[d]" and that it was his opinion that the decedent's coal worker's pneumoconiosis caused his treatment for pneumonia to be prolonged. When he was asked, "No, I'm asking you do you know if it caused, not whether it might have. Do you know that that caused his pneumonia?" Dr. Joseph responded, "I cannot prove it." He stated that on April 27, 1983, Mr. Helm had pneumonia, which was resolving at that time and that his signs and symptoms were compatible with pneumonia resolving. He stated that Mr. Helm had given him a history of a cold that would suggest it was the "primary onset for the pneumonia."

On redirect examination Dr. Joseph stated that it remained his opinion, expressed earlier, that the embolus was thrown, or shaken loose, while the decedent was in the hospital, as opposed to some time prior to his hospitalization. He expressed the view that the embolus was thrown around the time the lung scan was performed because of Mr. Helm's increasing respiratory problems at that time. He testified that he did not know when the thrombus developed from which the embolus was shaken loose. Dr. Joseph stated on redirect examination that it remained his opinion that coal worker's pneumoconiosis was a

contributing factor in the death of the decedent, which opinion, he stated on re-cross-examination, was based upon the decedent's history, pathology report, and clinical symptoms. The "history" to which he referred, he said, includes the history he had obtained when he was Mr. Helm's primary physician.

The employer called as a witness its employee Wayne Hankins, who testified that he had worked with the decedent, who had wrapped his leg with "elastic" every morning "before starting time and the same when he came out of the mine, he had it bandaged up but he did not complain." Mr. Helm had wrapped his leg in this manner, the witness believed, every day the entire time he had been acquainted with Mr. Helm from March of 1960 until his retirement in January of 1983.

For the employer, Dr. Echols A. Hansbarger, the pathology director for the laboratories at St. Francis Hospital in Charleston, West Virginia, testified by evidence deposition taken on October 24, 1988, that he had examined the decedent's records, including slides of lung tissue taken upon autopsy. Dr. Hansbarger stated that he felt that the decedent did suffer from simple coal worker's pneumoconiosis but that, in his opinion, it had no effect on his respiratory system. He described the basic signs and symptoms of pneumonia from a clinical standpoint:

> "Pneumonia is a clinical condition in which there is an inflammation of the lung. It can be caused by any one of a number of things, bacteria, viruses[,] rickettsiae. It is essentially an inflammatory process, and as a result, the patient developes [*sic*] systemic symptoms such as fever, headache, and, in particular, cough which may be due to local irritation. There are specific laboratory findings, specific x-ray findings to point out the presence of pneumonia."

Dr. Hansbarger characterized the decedent's coal worker's pneumoconiosis as "very mild," "barely there," and concluded, in view of the mildness of the disease, that there was no respiratory impairment based upon his coal worker's pneumoconiosis. The witness did not believe that the mild coal worker's pneumoconiosis from which the decedent suffered contributed to his disease on either a primary or a secondary basis. Dr. Hansbarger had, he said, "reached a cause of death, arteriosclerosis and acute thromboembolism."

On cross-examination he stated that the effect, if any, of the presence of clinically significant underlying pneumoconiosis, emphysema, and/or chronic obstructive-pulmonary disease upon the treatment of an acute pneumonia depends on the severity of the disease. He said

that individuals who are bedridden have statistically an increased risk of venous problems and potential thromboembolism. Asked on cross-examination, "So if a person, as a result of a pneumonia superimposed on underlying primary pulmonary disease, is confined to bed and subsequently develops a thromboemboli, the existence of the underlying chronic pulmonary disease could have been a contributing factor in the development of that thromboemboli, is that correct?" the witness responded, "Depending on the severity of the original disease." It could do so "[i]n certain circumstances depending on the severity." Asked further, "And then if that thromboemboli [*sic*] were to result in death, the underlying chronic lung disease could have been a causative factor of the death?" he answered, "Yes, based on the severity of the disease." On redirect examination he stated, "I am not really impressed by the pulmonary disease that I found in the lungs, other than the emphysema. It seems to me that the emphysema was much more severe than the coal worker's pneumoconiosis." The witness reiterated his opinion that the coal worker's pneumoconiosis did not contribute to the death of Mr. Helm. The slides taken upon autopsy constituted a substantial basis of his opinion.

Also testifying on behalf of the employer by evidence deposition, taken on August 14, 1989, was Dr. David Main, affiliated with the Carle Clinic in Urbana, Illinois, and board-certified in internal medicine, pulmonary medicine, and occupational medicine. He is a B reader, that is, a person certified to read chest X rays for pneumoconiosis, as recognized by the National Institute of Occupational Safety and Health and the American College of Radiology. Dr. Main had reviewed the decedent's records and expressed the opinion that the decedent did have "some amount" of simple coal worker's pneumoconiosis. He expressed the further opinion that at the time of his admission to the hospital the decedent probably had a "small pneumonia" in the lower part of the lung on the right although he could also have had a pulmonary embolus at that time. In the opinion of Dr. Main, the decedent's coal worker's pneumoconiosis was unrelated to the pneumonia or pulmonary embolus at the time of admission to the hospital and his coal worker's pneumoconiosis did not prolong the course of his treatment upon being admitted to the hospital. The role played by underlying chronic lung disease in the treatment of pneumonia depends, he said, upon the extent of the illness or impairment of lung function.

On cross-examination Dr. Main testified that treatment of pneumonia in an individual with severe underlying chronic obstructive-pulmonary disease or other chronic lung disease, to the extent that lung

function is very much impaired, can be more difficult than treatment of pneumonia in a person without any underlying lung disease. "[I]mmobilization is," he said, "definitely a risk factor for developing a pulmonary embolus." Any condition that immobilizes a person so that he is not getting up and walking around places him at higher risk of developing a pulmonary embolus. He testified that persons with severe chronic obstructive lung disease such as bronchitis or emphysema or severe fibrosis do get pneumonia more often and suffer more with it than do those without such chronic lung disease. Fibrosis, he said, can be a finding of coal worker's pneumoconiosis. Dr. Main did not feel that the decedent

> "had enough underlying chronic lung disease to interfere with his ability to walk around or to have any impairment in his ability to get up and walk around whether he had a pneumonia or didn't have a pneumonia, so in this case I don't think the chronic obstructive lung disease was of a magnitude to impair that ability to walk around."

In its decision and opinion upon review, the Commission expressly noted

> "that all of the medical experts agree that the chronic obstructive pulmonary disease, either as black lung disease or emphysema[,] can make a person more susceptible to pneumonia, and/or impair recovery, thus necessitating longer bedrest leading to thromboemboli in the lung. The experts are in dispute as to whether Decedent had pulmonary disease which was sufficiently serious to start this causal chain. The two treating doctors and the doctor who performed the autopsy state that the disease was severe enough to start the causal chain. [Claimant] also testified that the Decedent had been having breathing problems and deteriorating health for 10-12 years prior to his death. Respondent's experts who never examined Decedent are of the opinion that Decedent's disease was mild and could not start the causal chain. The Commission chooses to rely on the opinions of the treating doctors who performed the autopsy."

The Commission found that the decedent had died of a condition that had resulted from

> "his weakened condition of black lung disease and emphysema which was caused by his employment. Accordingly, the black lung disease and emphysema were predisposing causes of death, and therefore, Decedent's death was causally related to his exposure to the hazards of an occupational disease."

On judicial review the circuit court determined that the decision of the Commission is against the manifest weight of the evidence, reversing it and affirming the decision of the arbitrator.

It is well established that the resolution of conflicting medical testimony falls within the purview of the Commission, and its finding will not be reversed unless contrary to the manifest weight of the evidence (*Johns-Manville Products Corp. v. Industrial Comm'n* (1979), 78 Ill. 2d 171, 399 N.E.2d 606). When the Commission is faced with the question of which of two conflicting views of medical testimony should be adopted, it is for the Commission to ascertain the testimony that is to be accepted. (*International Harvester v. Industrial Comm'n* (1982), 93 Ill. 2d 59, 442 N.E.2d 908.) It is within the prerogative of the Commission to decide disputed issues of fact involving diverse medical opinions, including those of causal connection. (*International Harvester v. Industrial Comm'n* (1982), 93 Ill. 2d 59, 442 N.E.2d 908.) Here, in the face of conflicting medical evidence, the Commission chose to rely upon the opinions of the two doctors who treated Mr. Helm and the opinion of the pathologist who performed the autopsy. We note that the Commission said that these three experts stated that Mr. Helm's pulmonary disease was severe enough to start the causal chain; although that statement appears not to have been testified to expressly by these three physicians, the conclusion is implicit in the opinion expressed by each that Mr. Helm's pneumoconiosis was a factor contributing to his death. In light of all of the evidence, it was not against the manifest weight of the evidence for the Commission to have reached a decision in favor of the claimant. Thus, its decision may not be set aside. The judgment of the circuit court is accordingly reversed, and the decision of the Commission is confirmed.

Reversed.

McCULLOUGH, P.J., and WOODWARD, STOUDER, and RAKOWSKI, JJ., concur.